**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

SOLERS, INCORPORATED,
            *Plaintiff-Appellant,*

v.

HARTFORD CASUALTY INSURANCE
COMPANY,

            *Defendant-Appellee.*

No. 01-1862

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(CA-00-1947-A)

Argued: February 26, 2002

Decided: June 12, 2002

Before MOTZ, KING, and GREGORY, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Daniel J. Tobin, KIRKPATRICK & LOCKHART,
L.L.P., Washington, D.C., for Appellant. Richard Wayne Driscoll,
ECCLESTON & WOLF, P.C., Washington, D.C., for Appellee. **ON
BRIEF:** Ronald W. Fuchs, ECCLESTON & WOLF, P.C., Washing-
ton, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

After being sued in the state court of Virginia and settling that suit, appellant Solers, Inc. (Solers) brought suit against appellee Hartford Casualty Insurance Company (Hartford), claiming that Hartford was obligated to defend and indemnify Solers under the "advertising injury" provision of an insurance contract entered into between the parties. On cross motions for summary judgment, the district court granted summary judgment in favor of Hartford. For the reasons that follow, we affirm.

### I.

The pertinent facts in this case, as set forth more fully by the district court, *Solers, Inc. v. Hartford Casualty Ins. Co.*, 146 F. Supp.2d 785 (E.D.Va. 2001), are as follows: Solers is a software engineering firm founded by David Kellogg and Joseph Smith. Before founding Solers, Kellogg and Smith were employed by Decision Science Applications, Inc. (DSA). After DSA was acquired by SM & A Corporation (SM & A), Kellogg and Smith, displeased with new management, left SM & A and formed Solers in November 1998.

Solers purchased an insurance policy from Hartford effective for a one year period commencing on January 4, 1999 and ending January 4, 2000. In the policy, Hartford agreed to pay for any damages that Solers might become legally obligated to pay for an "advertising injury"[1] caused by an offense committed by Solers "in the course of advertising goods, products or services." (Policy, ¶ A.1.b(2)(b)).

---

[1] The Business Liability Coverage section of the insurance policy states in part: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury', 'property damage,' 'personal injury' or 'advertising injury' to which the insurance applies." (Policy ¶ A.1.a)

To launch its business, Solers submitted proposals to two federal contractors, Charles Stark Draper Laboratory (Draper) and Boeing Information Services, Inc. (Boeing).[2] Prior to making the bid proposals, Solers had been in contact with both Draper and Boeing, and both companies asked Solers to submit proposals. Solers submitted its bid proposal to Draper on December 18, 1998, prior to the effective date of its insurance policy. However, it submitted the bid to Boeing on January 11, 1999, which falls within the policy period. SM & A, believing that the proposals submitted by Solers were based on proposals that Solers misappropriated from SM & A, brought suit in Virginia Circuit Court against Solers in February 1999 for: (1) breach of common law fiduciary duty and duty of loyalty, (2) violation of Virginia Code §§ 18.2-499 and 18.2-500, (3) common law conspiracy, (4) corporate raiding via intentional interference with contractual relations and business expectancies, and employment relationships, (5) misappropriation of trade secrets, and (6) conversion.

During the pendency of the SM & A suit, Solers demanded that Hartford defend and indemnify it pursuant to the "advertising injury" coverage in the policy. Hartford refused, asserting that any injury caused by Solers did not occur "in the course of advertising" and thus did not qualify as an "advertising injury" under the policy. Solers eventually settled the suit with SM & A and agreed to pay SM & A for damages as well as for litigation and settlement expenses, fees and costs of the lawsuit, which totaled $714,471.76.

After settling with SM & A, Solers brought a breach of contract action against Hartford in the United States District Court for the Eastern District of Virginia. Jurisdiction was based on diversity of citizenship. *See* 28 U.S.C. § 1332(a). Hartford moved for summary judgment. Solers opposed Hartford's motion and filed a cross-motion for summary judgment. The district court concluded that Hartford did not have a duty to defend Solers because the bid proposals did not

---

[2]The solicitation of business from federal government agencies is regulated by federal law contained in the Federal Acquisition Regulations and Defense Federal Acquisition Regulations Supplement, 48 C.F.R. §§ 1-99, 200-99. These regulations require agencies and contractors to abide by certain regulatory protocols in the solicitation and award of government contracts.

constitute "advertising." Accordingly, the court granted Hartford's motion for summary judgment. This appeal followed.

## II.

We review the grant of summary judgment *de novo*. *JKC Holding Co., LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Here, the parties agree that there are no material issues of fact in dispute.

## III.

The crux of the dispute on appeal involves the definition of the term "advertising." Hartford only had a duty to defend Solers if SM & A's amended complaint claimed an "advertising injury." The policy listed four definitions for that term.[3] However, under the policy, Hartford's duty to defend was triggered only if a complaint against Solers alleged an "'advertising injury' caused by an offense committed *in the course of advertising* goods, products or services." (Policy, ¶ A.1.b(2)(b)) (emphasis added). Thus, the threshold question in determining coverage is whether Solers was engaged in advertising when it allegedly committed offenses against SM & A. *See Solers*,

---

[3]"Advertising injury" means injury arising out of one or more of the following offenses:

> a.   Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

> b.   Oral or written publication of material that violates a person's rights of privacy;

> c.   Misappropriation of advertising ideas or styles of doing business; or

> d.   Infringement of copyright, title or slogan.

(Policy ¶ G.1)

146 F. Supp.2d at 792.[4] We agree with the district court that it was not, though we do not adopt the district court's definition of the term "advertising."

The contract between Solers and Hartford was formed in Virginia and both parties agree that it is governed by Virginia law. Unfortunately, the contract does not define the term "advertising," nor has the Supreme Court of Virginia defined the term. Solers contends that the term "advertising" is ambiguous and thus should be broadly construed in its favor to include the one-to-one bid proposals submitted here. Solers points out that it provides services exclusively pursuant to government contract, and widespread public dissemination is not appropriate for its business. Solers asserts that its only advertising mechanism is the submission of written business proposals, and argues that the court must find the proposals constitute advertising because to hold otherwise on the grounds that the proposals are not directed at the public at large would be to hold that companies with small, but well-defined markets cannot, as a matter of law, engage in advertising. *See Solers*, 146 F. Supp.2d at 790-91.

Under Virginia law, when "policy language is ambiguous, it will be construed strictly against the insurer." *Lincoln Nat'l Life Ins. Co. v. Commonwealth Corrugated Container Corp.*, 229 Va. 132, 136, 327 S.E.2d 98, 101 (1985). But, of course, in order for this rule to help a party, the challenged term or phrase must be able to bear the meaning that party seeks to put on it. We hold that the "ordinary and accepted meaning" *see Craig v. Dye*, 259 Va. 533, 538, 526 S.E.2d 9, 12 (2000), of the term "advertising" will not bear the meaning Solers seeks to give it. As the district court explained, generally, a lay

---

[4]The district court correctly stated the three part test for determining whether the policy covers the allegations made by SM & A, which includes a determination into 1) whether the insured was engaged in advertising, 2) whether the insured's alleged conduct was one of the offenses enumerated by the policy as giving rise to an advertising injury, and 3) whether the injury arose from an offense committed during the policy period and in the course of the advertising injury. *Solers*, 146 F. Supp.2d at 792. We need not reach the second and third parts of this test because we, like the district court, find that Solers was not engaged in advertising here.

person would not read the term "advertising" as including an effort to sell, through a competitive bidding process, a product that is "specifically tailored for a single customer to meet the needs of a specific project—which is what occurred in this case." *Solers*, 146 F. Supp.2d at 793. Solers' bid proposals did not generally notify Draper and Boeing of its products or services. Instead, they were *specifically tailored* for Draper and Boeing, and they were made in response to requests by Draper and Boeing. The bid proposals were offers to provide Boeing and Draper with specific services, and they gave detailed plans of how Solers would provide such services, and at what price.

Our inquiry into the plain meaning of "advertising" ends with our determination that "advertising" and the solicitation of bids that occurred here are mutually exclusive. The district court need not have gone further, and we do not necessarily agree with the district court's narrow definition of the term "advertising" to mean "the widespread promotion of goods or services to the public at large, or to the company's customer base." *Solers*, 146 F. Supp.2d at 786. Indeed, the term "advertising" might not exclude activity, even directed towards one customer, which involves the unsolicited dissemination of information giving notice of the general nature of one's business and the services or products available for hire or sale. However, we decline to reach that issue.

IV.

Because the plain meaning of "advertising" will not support the submission of bid proposals that occurred here, we affirm the judgment of the district court.

*AFFIRMED*